**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF DELAWARE; COMMONWEALTH OF VIRGINIA; STATE OF MARYLAND; STATE OF NEW YORK,<br><br>             Plaintiffs-Appellees,<br><br>  v.<br><br>ALEX M. AZAR II, Secretary of the United States Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; R. ALEXANDER ACOSTA, in his official capacity as Secretary of the U.S. Department of Labor; U.S. DEPARTMENT OF LABOR; STEVEN TERNER MNUCHIN, in his official capacity as Secretary of the U.S. Department of the Treasury; U.S. DEPARTMENT OF THE TREASURY,<br><br>             Defendants,<br><br> and<br><br>THE LITTLE SISTERS OF THE POOR JEANNE JUGAN RESIDENCE,<br><br>        Intervenor-Defendant-<br>        Appellant. | No.   18-15144<br><br>D.C. No. 4:17-cv-05783-HSG<br><br>OPINION |

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF | No.   18-15166 |

DELAWARE; COMMONWEALTH OF VIRGINIA; STATE OF MARYLAND; STATE OF NEW YORK,

        Plaintiffs-Appellees,

  v.

ALEX M. AZAR II, Secretary of the United States Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; R. ALEXANDER ACOSTA, in his official capacity as Secretary of the U.S. Department of Labor; U.S. DEPARTMENT OF LABOR; STEVEN TERNER MNUCHIN, in his official capacity as Secretary of the U.S. Department of the Treasury; U.S. DEPARTMENT OF THE TREASURY,

        Defendants,

 and

MARCH FOR LIFE EDUCATION AND DEFENSE FUND,

      Intervenor-Defendant-
      Appellant.

D.C. No. 4:17-cv-05783-HSG

---

STATE OF CALIFORNIA; STATE OF DELAWARE; COMMONWEALTH OF VIRGINIA; STATE OF MARYLAND; STATE OF NEW YORK,

        Plaintiffs-Appellees,

  v.

No.   18-15255

D.C. No. 4:17-cv-05783-HSG

ALEX M. AZAR II, Secretary of the United States Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; R. ALEXANDER ACOSTA, in his official capacity as Secretary of the U.S. Department of Labor; U.S. DEPARTMENT OF LABOR; STEVEN TERNER MNUCHIN, in his official capacity as Secretary of the U.S. Department of the Treasury; U.S. DEPARTMENT OF THE TREASURY,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted October 19, 2018
San Francisco, California

Before: J. Clifford Wallace, Andrew J. Kleinfeld, and Susan P. Graber, Circuit Judges.

Opinion by Judge Wallace

WALLACE, Circuit Judge:

The Affordable Care Act (ACA) and the regulations implementing it require group health plans to cover contraceptive care without cost sharing. Federal agencies issued two interim final rules (IFRs) exempting employers with religious and moral objections from this requirement. Several states sued to enjoin the enforcement of the IFRs, and the district court issued a nationwide preliminary

injunction.  We have jurisdiction under 28 U.S.C. § 1292, and we affirm in part, vacate in part, and remand.

## I.

### A.

To contextualize the issues raised on appeal, we briefly recount the history of the ACA's contraceptive coverage requirement.  The ACA provides that:

> a group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA] . . . .

42 U.S.C. § 300gg–13(a)(4).  HRSA established guidelines for women's preventive services that include any "[FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling."  Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725-01, 8,725 (Feb. 15, 2012).  The three agencies responsible for implementing the ACA—the Department of Health and Human Services, the Department of Labor, and the Department of the Treasury (collectively, agencies)—issued regulations requiring coverage of all preventive services contained in HRSA's guidelines.  *See, e.g.*, 45 C.F.R. § 147.130(a)(1)(iv) (DHSS regulation).

The agencies also recognized that religious organizations may object to the

4

use of contraceptive care and offering health insurance that covers such care. For those organizations, the agencies provided two avenues. First, group health plans of certain religious employers, such as churches, are categorically exempt from the contraceptive coverage requirement. *Coverage of Certain Preventive Services Under the Affordable Care Act*, 78 Fed. Reg. 39,870, 39,874 (July 2, 2013). Second, nonprofit "eligible organizations" that are not categorically exempt can opt out of having to "contract, arrange, pay, or refer for contraceptive coverage." *Id.* To be eligible, the organization must file a self-certification form stating (1) that it "opposes providing coverage for some or all of any contraceptive services required to be covered under [the regulation] on account of religious objections," (2) that it "is organized and operates as a nonprofit entity," and (3) that it "holds itself out as a religious organization." *Id.* at 39,892. The organization sends a copy of the form to its insurance provider, which must then provide contraceptive coverage for the organization's employees and cannot impose any charges related to the coverage. *Id.* at 39,876. The regulations refer to this second avenue as the "accommodation," and it was designed to avoid imposing on organizations' beliefs that paying for or facilitating coverage for contraceptive care violates their religion. *Id.* at 39,874.

The agencies subsequently amended the accommodation in response to several legal challenges. First, certain closely-held for-profit organizations became

5

eligible for the accommodation. Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318-01, 41,343 (July 14, 2015); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2785 (2014). Second, instead of directly sending a copy of the self-certification form to the insurance provider, an eligible organization could simply notify the Department of Health and Human Services in writing, and the agencies then would inform the provider of its regulatory obligations. 80 Fed. Reg. at 41,323; *see also Wheaton Coll. v. Burwell*, 134 S. Ct. 2806, 2807 (2014).

Various employers then challenged the amended accommodation as a violation of the Religious Freedom Restoration Act (RFRA). *Zubik v. Burwell*, 136 S. Ct. 1557, 1559 (2016) (per curiam). The actions reached the Supreme Court, but, instead of deciding the merits of the claims, the Supreme Court vacated and remanded to afford the parties "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage." *Id.* (internal quotation marks and citation omitted). The agencies solicited comments on the accommodation in light of *Zubik*, but ultimately declined to make further changes to the accommodation. Dep't of Labor, FAQS ABOUT AFFORDABLE CARE ACT IMPLEMENTATION PART 36, at 4, www.dol.gov/sites/default/files/ebsa/about-

6

ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

B.

On May 4, 2017, the President issued an executive order directing the secretaries of the agencies to "consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to" the ACA's contraceptive coverage requirement. Promoting Free Speech and Religious Liberty, Exec. Order No. 13,798, 82 Fed. Reg. 21,675, 21,675 (May 4, 2017). On October 6, 2017, the agencies effectuated the two IFRs challenged here, without prior notice and comment. The religious exemption IFR expanded the categorical exemption to all entities "with sincerely held religious beliefs objecting to contraceptive or sterilization coverage" and made the accommodation optional for such entities. Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,807–08 (Oct. 13, 2017). The moral exemption IFR expanded the categorical exemption to "include additional entities and persons that object based on sincerely held moral convictions." Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838, 47,849 (Oct. 13, 2017). It also "expand[ed] eligibility for the accommodation to include organizations with sincerely held moral convictions concerning contraceptive coverage" and made the accommodation optional for those entities.

7

*Id.*

California, Delaware, Maryland, New York, and Virginia sued the agencies and their secretaries in the Northern District of California. The states sought to enjoin the enforcement of the IFRs, alleging that they are invalid under the Administrative Procedure Act (APA), the Fifth Amendment equal protection component of the Due Process Clause, and the First Amendment Establishment Clause. The district court held that venue was proper and that the states had standing to challenge the IFRs. The district court then issued a nationwide preliminary injunction based on the states' likelihood of success on their APA claim—that the IFRs were procedurally invalid for failing to follow notice and comment rulemaking. After issuing the injunction, the district court allowed Little Sisters of the Poor, Jeanne Jugan Residence (Little Sisters) and March for Life Education and Defense Fund (March for Life) to intervene in the case.

The agencies, Little Sisters, and March for Life appeal from the district court's order on venue, standing, and nationwide preliminary injunction.

II.

Venue is reviewed de novo. *Immigrant Assistance Project of the L.A. Cty. Fed'n of Labor (AFL-CIO) v. INS*, 306 F.3d 842, 868 (9th Cir. 2002). Standing is also reviewed de novo. *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 506 (9th Cir. 1991). Findings of fact used to support standing are

8

reviewed for clear error. *Id.*

A preliminary injunction is reviewed for abuse of discretion. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). In reviewing the injunction, we apply a two-part test. First, we "determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *Id.* (quoting *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1104 (9th Cir. 2010). Second, we determine "if the district court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (quoting *Cal. Pharmacists*, 596 F.3d at 1104). The scope of the preliminary injunction, such as its nationwide effect, is also reviewed for abuse of discretion. *United States v. Schiff*, 379 F.3d 621, 625 (9th Cir. 2004).

## III.

### A.

We first address whether the appeal is moot. We have authority only to decide live controversies, and because mootness is a jurisdictional issue, we are obliged to raise it sua sponte. *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (en banc). We determine "questions of mootness in light of the present circumstances where injunctions are involved." *Mitchell v. Dupnik*, 75 F.3d 517, 528 (9th Cir. 1996). More specifically, the question before us is

"whether changes in circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief." *Gator.com*, 398 F.3d at 1129 (quoting *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 925 n.4 (9th Cir. 2000)).

On November 15, 2018, the agencies published final versions of the religious and moral exemption IFRs. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536 (Nov. 15, 2018); Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,592 (Nov. 15, 2018). The final rules are set to supersede the IFRs and become effective on January 14, 2019. *Id.* The district court's preliminary injunction rested solely on its conclusion that the IFRs are likely to be procedurally invalid under the APA. If the final rules become effective as planned on January 14, there will be no justiciable controversy regarding the procedural defects of IFRs that no longer exist. Indeed, we have previously dismissed a procedural challenge to an interim rule as moot after the rule expired. *Safari Aviation Inc. v. Garvey*, 300 F.3d 1144, 1150 (9th Cir. 2002); *see also NRDC v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 814–15 (D.C. Cir. 1982) (holding that procedural challenge to a regulation promulgated in violation of notice and comment requirements was rendered moot by re-promulgation of rule

10

with prior notice and comment); *The Gulf of Me. Fishermen's All. v. Daley*, 292 F.3d 84, 88 (1st Cir. 2002) ("[P]romulgation of new regulations and amendment of old regulations are among such intervening events as can moot a challenge to the regulation in its original form").

However, it is not yet January 14. We agree with the parties that mootness is not an issue until the final rules supersede the IFRs as expected on January 14, 2019. The IFRs have not been superseded yet, and the procedural validity of the IFRs is a live controversy. We can still grant the parties effective relief. Mootness, if at all, will arise only after our decision has issued. Accordingly, we have jurisdiction to decide this appeal.

## B.

We hold that venue is proper in the Northern District of California. A civil action against an officer of the United States in his or her official capacity may "be brought in any judicial district in which . . . the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). There is no real property involved here. The inquiry thus turns on which judicial district(s)—for a state with multiple districts like California—a state is considered to reside. This is a question of first impression in this circuit.

The agencies argue that California resides only in the Eastern District of California, where the state capital is located. The agencies cite 28 U.S.C. §

11

1391(c), which defines residency for "a natural person," "an entity," and "a defendant not resident in the United States." Relevant here, "an entity with the capacity to sue and be sued . . . whether or not incorporated" is deemed to reside "only in the judicial district in which it maintains its principal place of business." *Id*. § 1391(c)(2). The agencies argue that California is an "entity" and that its capital Sacramento, located in the Eastern District of California, is the principal place of business for the state.

The agencies' argument is unconvincing. We must "interpret [the] statut[e] as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *United States v. Thomsen*, 830 F.3d 1049, 1057 (9th Cir. 2016) (citation omitted and alterations in original). The venue statute explicitly refers to the incorporation status of the "entity," indicating that the term refers to some organization, not a state. *See* 28 U.S.C. § 1391(c)(2) ("an entity . . . whether or not incorporated"). The legislative history confirms this interpretation. According to the House Report underlying section 1391(c)(2), the section is a response to "division in authority as to the venue treatment of unincorporated associations" and that the section, as stated, would treat equally corporations and unincorporated associations like partnerships and labor unions. *See* H.R. Rep. No. 112-10, at 21 (2011). These types of entities do not encompass sovereign states.

12

Finally, we highlight that the statute explicitly distinguishes between states and entities. 28 U.S.C. § 1391(d); *see also Spencer Enters., Inc. v. United States.*, 345 F.3d 683, 689 (9th Cir. 2003) ("[U]se of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words"). The agencies therefore improperly assume, without support from the text or legislative history, that "entity" encompasses a state acting as a plaintiff.

Instead, we interpret the statute based on its plain language. A state is ubiquitous throughout its sovereign borders. The text of the statute therefore dictates that a state with multiple judicial districts "resides" in every district within its borders. *See Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005) (holding that, for purposes of 28 U.S.C. § 1391(e), "common sense dictates that a state resides throughout its sovereign borders"); *see also Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892) (discussing that "the state government . . . resides at every point within the boundaries of the state"). Any other interpretation limiting residency to a single district in the state would defy common sense. *See Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 900 (9th Cir. 2005) ("[C]ourts will not interpret a statute in a way that results in an absurd or unreasonable result"). Venue is thus proper in the Northern District of California.

C.

13

We hold that the states have standing to sue. The states bear the burden of establishing "the irreducible constitutional minimum" of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks omitted). The states must have suffered an injury-in-fact that is fairly traceable to the challenged conduct and that is likely to be redressed by a favorable judicial decision. *Id.* The states must also demonstrate standing for each claim they seek to press. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Standing as to one claim does not "suffice for all claims arising from the same 'nucleus of operative fact.'" *Id.*

The district court held that the states had standing to assert their procedural APA claim. To establish an injury-in-fact, a plaintiff challenging the violation of a procedural right must demonstrate (1) that he has a procedural right that, if exercised, could have protected his concrete interests, (2) that the procedures in question are designed to protect those concrete interests, and (3) that the challenged action's threat to the plaintiff's concrete interests is reasonably probable. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969–70 (9th Cir. 2003); *see also Spokeo*, 136 S. Ct. at 1540 (describing the applicable standards for Article III standing in the context of statutory procedural rights). "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing." *Summers v.*

14

*Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Relaxed standards apply to the traceability and redressability requirements.  *See NRDC v. Jewell*, 749 F.3d 776, 782–83 (9th Cir. 2014) (en banc) ("One who challenges the violation of 'a procedural right to protect his concrete interests can assert that right without meeting all the normal standards' for traceability and redressibility."  (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992))).  The plaintiff need not prove that the substantive result would have been different had he received proper procedure; all that is necessary is to show that proper procedure *could* have done so.  *Citizens for Better Forestry*, 341 F.3d at 976.

The states argue that the agencies issued the religious and moral exemption IFRs without notice and comment as required under the APA.  They argue that the deprivation of this procedural right affected their economic interests.  According to the states, the IFRs expanded the number of employers categorically exempt from the ACA's contraceptive coverage requirement, and states will incur significant costs as a result of their residents' reduced access to contraceptive care.  The states specifically identify three ways in which the IFRs will economically harm them.  First, women who lose coverage will seek contraceptive care through state-run programs or programs that the states are responsible for reimbursing.  Second, women who do not qualify for or cannot afford such programs will be at risk for unintended pregnancies, which impose financial costs on the state.  Third, reduced

15

access to contraceptive care will negatively affect women's educational attainment and ability to participate in the labor force, affecting their contributions as taxpayers. Because we conclude that the record supports the first theory, we do not reach the alternative theories. *See, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1161 & n.5 (9th Cir. 2017) (per curiam) (holding that the plaintiffs had standing and declining to reach alternative theories of standing).

Appellants do not dispute that the states were denied notice and opportunity to comment on the IFRs prior to their effective date. They do not dispute that the notice and comment process could have protected and was designed to protect the states' economic interests. Instead, the appellants dispute whether the threat to the states' economic interests is reasonably probable. They argue that the allegations of economic injury are based on a speculative chain of events unlikely to occur. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (rejecting standing where "respondents' speculative chain of possibilities does not establish that injury . . . is certainly impending or is fairly traceable"). Appellants highlight how the states have failed to prove (1) that employers will take advantage of the expanded religious and moral exemptions, (2) that women will lose contraceptive coverage as a result, and (3) that states will then incur economic costs.

We hold that the states have standing to sue on their procedural APA claim. The states show, with reasonable probability, that the IFRs will first lead to women

16

losing employer-sponsored contraceptive coverage, which will then result in economic harm to the states. *See Citizens for Better Forestry*, 341 F.3d at 969. Just because a causal chain links the states to the harm does not foreclose standing. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) ("A causal chain does not fail simply because it has several 'links,' provided those links are not hypothetical or tenuous" (internal quotation marks and citation omitted)). The states need not have already suffered economic harm. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (requiring only that the protected concrete interest be "threatened"). There is also no requirement that the economic harm be of a certain magnitude. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (explaining that injuries of only a few dollars can establish standing).

First, it is reasonably probable that women in the plaintiff states will lose some or all employer-sponsored contraceptive coverage due to the IFRs. The agencies' own regulatory impact analysis (RIA)—which explains the anticipated costs, benefits, and effects of the IFRs—estimates that between 31,700 and 120,000 women nationwide will lose some coverage. *See* 82 Fed. Reg. at 47,821, 47,823. Importantly, when making these estimates, the agencies accounted for key factors likely to skew the estimate, including that some objecting employers will continue to use the accommodation instead of the new, expanded exemptions. *See*

17

*id.* at 47,818 (estimating that 109 entities—of the 209 entities who have litigated the contraceptive care requirement and are currently using the accommodation process—would seek exemption); *id.* ("We expect the 122 nonprofit entities that specifically challenged the accommodation in court to use the expanded exemption"). The record also includes names of specific employers identified by the RIA as likely to use the expanded exemptions, including those operating in the plaintiff states like Hobby Lobby Stores, Inc. Appellants fault the states for failing to identify a specific woman likely to lose coverage. Such identification is not necessary to establish standing. For example, in *Sierra Forest Legacy v. Sherman*, California challenged a forest-management plan that changed the standards governing logging on a parcel of land. 646 F.3d 1161, 1171–72 (9th Cir. 2011). The state's standing to do so was based on future injury resulting from any logging under the plan. *Id.* at 1178 (maj. op. of Fisher, J.). We emphasized that the state's standing to challenge the plan "is not defeated by its not having submitted affidavits establishing approval of specific logging projects under" the plan because "there is no real possibility that the [relevant agency] will . . . decline to adopt" any project under the plan. *Id.* at 1179. The same is true here. Evidence supports that, with reasonable probability, some women residing in the plaintiff states will lose coverage due to the IFRs.

18

Second, it is reasonably probable that loss of coverage will inflict economic harm to the states. The RIA estimates the direct cost of filling the coverage loss as $18.5 or $63.8 million per year, depending on the method of estimating. 82 Fed. Reg. at 47,821, 47,824. More importantly, the RIA identifies that state and local programs "provide free or subsidized contraceptives for low-income women" and concludes that this "existing inter-governmental structure for obtaining contraceptives significantly diminishes" the impact of the expanded exemptions. *Id.* at 47,803. The RIA itself thus assumed that state and local governments will bear additional economic costs.

The declarations submitted by the states further show that women losing coverage from their employers will turn to state-based programs or programs reimbursed by the state. For example, California offers the Family Planning, Access, Care, and Treatment (Family PACT) program to provide contraceptive care to those below 200% of the federal poverty level. As attested to by program administrators, loss of coverage due to the IFRs will result in increased enrollment to Family PACT. Increased enrollment translates into, for example, the state reimbursing Planned Parenthood about $74.96 for each enrollee who receives contraceptive care. The states provided similar evidence for New York, Maryland, Delaware, and Virginia, which all have state-funded family planning programs.

19

Appellants dispute various factual findings underlying standing, but they do not explain how those findings are clearly erroneous. Appellants also argue that four of the plaintiff states—California, Delaware, Maryland, and New York—will not suffer harm because they have state laws that independently require certain employer-provided plans to cover contraceptive care. Those state laws do not apply to self-insured (also called self-funded) plans. *See* 29 U.S.C. § 1144(a) (preempting "any and all state laws" on this subject). Evidence shows that millions of people are covered, in each of the four states, under self-insured plans. For example, Hobby Lobby Stores, Inc. covers its employees through self-insured plans. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1124 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). Appellants' argument does not even apply to Virginia, which does not have any state law requiring coverage for contraceptive care.

Accordingly, the states have shown that the threat to their economic interest is reasonably probable, and they have established a procedural injury. *Cf. East Bay Sanctuary Covenant v. Trump*, No. 18-17274, 2018 WL 6428204, at *12 n.8 (9th Cir. Dec. 7, 2018) (order) (holding that the plaintiffs "have adequately identified concrete interests impaired by the Rule and thus have standing to challenge the absence of notice-and-comment procedures in promulgating it"). "[T]he causation and redressability requirements are relaxed" once a plaintiff has established a

20

procedural injury, *Citizens for Better Forestry*, 341 F.3d at 975 (quoting *Pub.*

*Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1016 (9th Cir. 2003)), and both

requirements are met here.  The injury asserted is traceable to the agencies' issuing

the IFRs allegedly in violation of the APA's requirements, and granting an

injunction would prohibit enforcement of the IFRs.  The states have thus

established standing.[1]

The dissent raises a theory not advanced by any party.  According to the

dissent, the states' economic injuries, if any, will be self-inflicted because the

states voluntarily chose to provide money for contraceptive care to its residents

through state programs.  The dissent argues that the states lack standing because

such "self-inflicted" injuries are not traceable to the agencies' conduct, citing

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam).  In *Pennsylvania*,

the plaintiff states challenged other states' laws that increased taxes on nonresident

income.  426 U.S. at 662–63.  The plaintiff states provided tax credits to their

residents for taxes paid to other states.  *Id.* at 662.  Accordingly, the defendant

---

[1] In addition to establishing constitutional standing, "[a] plaintiff must also satisfy
the non-constitutional standing requirements of the statute under which [it] seeks to
bring suit."  *City of Sausalito*, 386 F.3d at 1199.  In a single sentence, Little Sisters
argues that the states lack statutory standing.  This argument is waived.  *See
Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues
which are argued specifically and distinctly in a party's opening brief . . . [and a]
bare assertion does not preserve a claim" (citation omitted)); *Bilyeu v. Morgan
Stanley Long Term Disability Plan*, 683 F.3d 1083, 1090 (9th Cir. 2012) (holding
that "statutory standing may be waived").

states' tax increases also increased the amount of tax credits provided by the plaintiff states, and the plaintiff states lost revenue. *Id.* In denying leave to file bills of complaint invoking the Supreme Court's original jurisdiction, the Court held that the plaintiff states could not "demonstrate that the injury for which [they sought] redress was directly caused by the actions of another State" because the injuries to the plaintiff states' fiscs "were self-inflicted . . . and nothing prevents [them] from withdrawing [the] credit for taxes paid to [defendant states]." *Id.* at 664.

We question whether the holding of *Pennsylvania* applies outside the specific requirements for the invocation of the Supreme Court's original jurisdiction. Courts regularly entertain actions brought by states and municipalities that face economic injury, even though those governmental entities theoretically could avoid the injury by enacting new legislation. *See, e.g.*, *South Dakota v. Dole*, 483 U.S. 203 (1987) (addressing South Dakota's challenge to highway funding conditioned on a minimum drinking age, even though South Dakota could have avoided the injury by changing its minimum drinking age); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110–11 (1979) (holding that a municipality suffered an injury from a reduction in its property tax base, even though nothing required the municipality to impose property taxes). But we need not decide whether *Pennsylvania*'s "self-infliction" doctrine applies to the ordinary

22

injury-in-fact requirement of Article III standing because, as explained below, the injury here is not "self-inflicted" within the meaning of *Pennsylvania*.

The Supreme Court later held, in *Wyoming v. Oklahoma*, that Wyoming had standing to challenge an Oklahoma statute that decreased Wyoming's revenue—from tax on coal mined in Wyoming—by requiring Oklahoma power plants to burn at least 10% Oklahoma-mined coal. 502 U.S. 437, 447–48 (1992). The Court highlighted that Wyoming suffered a "direct injury in the form of a loss of specific tax revenues" from the reduced demand for Wyoming coal caused by the Oklahoma statute. *Id.* at 448.

Both *Pennsylvania* and *Wyoming* involved harm to the plaintiff states' fiscs that were, as described by the dissent, "self-inflicted." What distinguishes the two cases, and what caused the Supreme Court to reach different results, is that the plaintiff states' laws in *Pennsylvania* directly and explicitly tied the states' finances (revenue loss caused by tax credit) to another sovereign's laws (other states' taxes on nonresident income). *See Maryland v. Louisiana*, 451 U.S. 725, 742 n.18 (1981) ("In *Pennsylvania*, the only reason that the complaining States were denied tax revenues was because their legislatures had determined to give a credit for taxes paid to other States, and, to this extent, any injury was voluntarily suffered"). *Wyoming* did not involve such state laws; the tax on Wyoming-mined coal was not so tethered to the legislative decisions of other sovereigns. The same is true of the

23

contraceptive coverage laws of the plaintiff states here. Accordingly, we are not convinced that *Pennsylvania* controls in this case. *Cf. Texas v. United States*, 809 F.3d 134, 158–59 (5th Cir. 2015), *as revised* (Nov. 25, 2015); *Texas v. United States*, 787 F.3d 733, 749 n.34 (5th Cir. 2015).

### D.

We affirm the preliminary injunction insofar as it bars enforcement of the IFRs in the plaintiff states, but we otherwise vacate the portion of the injunction barring enforcement in other states. The scope of the injunction is overbroad.

A preliminary injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (citation omitted). "A party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.'" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (alteration in original) (quoting *Winter*, 555 U.S. at 20). When the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

### 1.

Likelihood of success on the merits is "the most important" factor; if a movant fails to meet this "threshold inquiry," we need not consider the other factors. *Disney*, 869 F.3d at 856 (citation omitted). The district court held that the states are likely to succeed on the merits of their APA claim. We agree.

The APA requires that, prior to promulgating rules, an agency must issue a general notice of proposed rulemaking, 5 U.S.C. § 553(b), and "give interested persons an opportunity to participate in the rule making through submission of written data, views or arguments," *id.* § 553(c). A court must set aside rules made "without observance of [this] procedure." *Id.* § 706(2)(D). Again, the parties do not dispute that the religious and moral exemption IFRs were issued without notice and comment. The only remaining issue is whether prior notice and comment was not required because an exception to this rule applied.

Exceptions to notice and comment rulemaking "are not lightly to be presumed." *Marcello v. Bonds*, 349 U.S. 302, 310 (1955). "[I]t is antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later." *Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005). Failure to follow notice and comment rulemaking may be excused when good cause exists, 5 U.S.C. § 553(b)(B); when a subsequent statute authorizes it, *id.* § 559; and when it is harmless, *id.* § 706. Appellants argue that each of these three exceptions applies here.

25

We begin by examining whether the agencies had good cause for bypassing notice and comment. An agency may "for good cause find[] . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). "[T]he good cause exception goes only as far as its name implies: It authorizes departures from the APA's requirements only when compliance would interfere with the agency's ability to carry out its mission." *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1485 (9th Cir. 1992). Good cause is to be "narrowly construed and only reluctantly countenanced." *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984) (citation omitted). As such, the good cause exception is usually invoked in emergencies, and an agency must "overcome a high bar" to do so. *United States v. Valverde*, 628 F.3d 1159, 1164–65 (9th Cir. 2010). Because good cause is determined on a "case-by-case" basis, based on "the totality of the factors at play," *Valverde*, 628 F.3d at 1164 (quoting *Alcaraz*, 746, F.2d at 612), prior invocations of good cause to justify different IFRs—the legality of which are not challenged here—have no relevance. [2]

In the past, we have acknowledged good cause where the agency cannot "both follow section 553 and execute its statutory duties." *Riverbend*, 958 F.2d at

---

[2] The Little Sisters argue that if the court invalidates the IFRs here, the court must also invalidate prior ones related to the exemption and accommodation. This argument is unpersuasive. Whether or not those IFRs were promulgated with good cause, they are not before us at this time.

1484 n.2 (quoting *Levesque v. Block*, 723 F.2d 175, 184 (1st Cir. 1983)).  We have also acknowledged good cause where "'delay would do real harm' to life, property, or public safety."  *East Bay Sanctuary Covenant*, 2018 WL 6428204, at \*20 (quoting *Valverde*, 628 F.3d at 1165); *see also Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995) (good cause shown based on threat reflected in an increasing number of helicopter accidents); *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (upholding good cause determination that the rule was "necessary to prevent a possible imminent hazard to aircraft, persons, and property within the United States").

The agencies here determined that "it would be impracticable and contrary to the public interest to engage in full notice and comment rulemaking before putting these [IFRs] into effect."  *See, e.g.*, 82 Fed. Reg. at 47,815; *see also* 82 Fed. Reg. at 47,856.  They recited the immediate need to (1) reduce the legal and regulatory uncertainty regarding the accommodation in the wake of *Zubik*, (2) eliminate RFRA violations by reducing the burden on religious beliefs of objecting employers, and (3) reduce the costs of health insurance.[3]  82 Fed. Reg. at 47,813–

---

[3] Little Sisters argues that the agencies had good cause because the prior regulatory regime violated the Free Exercise Clause and the Establishment Clause.  This assertion was not part of the agencies' original good cause findings, and we may not consider it now.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself").

27

15; 82 Fed. Reg. at 47,855–56. These general policy justifications are insufficient to establish good cause.

First, an agency's desire to eliminate more quickly legal and regulatory uncertainty is not by itself good cause. *See Valverde*, 628 F.3d at 1167 (concluding that an agency's "interest in eliminating uncertainty does not justify its having sought to forego notice and comment"). "If 'good cause' could be satisfied by an Agency's assertion that 'normal procedures were not followed because of the need to provide immediate guidance and information[,] . . . then an exception to the notice requirement would be created that would swallow the rule.'" *Id.* (alterations in original) (quoting *Zhang v. Slattery*, 55 F.3d 732, 746 (2d Cir. 1995)); *see also Envtl. Def. Fund, Inc. v. EPA*, 716 F.2d 915, 920–21 (D.C. Cir. 1983) ("[I]t was not at all reasonable for [the agency] to rely on the good cause exception" simply because of "an alleged pressing need to avoid industry compliance with regulations that were to be eliminated"). Furthermore, the agencies' request for post-promulgation comments in issuing the IFRs "casts further doubt upon the authenticity and efficacy of the asserted need to clear up potential uncertainty," *Valverde*, 628 F.3d at 1166, because allowing for post-promulgation comments implicitly suggests that the rules will be reconsidered and that the "level of uncertainty is, at best, unchanged," *United States v. Reynolds*, 710 F.3d 498, 510 (3d Cir. 2013) (citing *United States v. Johnson,* 632 F.3d 912,

28

929 (5th Cir. 2011)). This explanation therefore fails. It is always the case that an agency can regulate—or in this case, de-regulate—faster by issuing an IFR without notice and comment.

Second, we of course acknowledge that eliminating RFRA violations by reducing the burden on religious beliefs is an important consideration for the agencies. Any delay in rectifying violations of statutory rights has the potential to do real harm. *See Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982) ("The notice and comment procedures in Section 553 should be waived only when delay would do real harm"). Whether the accommodation actually violates RFRA is a question left open by the Supreme Court.[4] *See Zubik*, 136 S. Ct. at 1560. But we need not determine whether there is a RFRA violation here because, even if immediately remedying the RFRA violation constituted good cause, the agencies' reliance on this justification was not a reasoned decision based on findings in the record. *See Valverde*, 628 F.3d at 1165, 1168 (agencies must provide "rational justification" and identify "rational connection between the facts found and the choice made to promulgate the interim rule" (internal quotation marks and citation omitted)). In January 2017, the agencies explicitly declined to change the

---

[4] Before *Zubik*, eight courts of appeals (of the nine to have considered the issue) have found that the regulatory regime in place prior to the IFRs did not impose a substantial burden on religious exercise under RFRA. *See, e.g.*, *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015), *vacated*, *Zubik*, 136 S.Ct. at 1561.

accommodation in light of *Zubik* and RFRA. They then let nine months go by and failed to specify what developments necessitated the agencies to change their position and determine, in October 2017, that RFRA violations existed. *Cf. id.* at 1166 (reasoning that agency finding of urgent need was inadequate when agency had allowed seven months to pass without action). The agencies provided no explanation, legal or otherwise, for their changed understanding. *Cf. Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016) (holding that an agency's unexplained change in position does not warrant deference); *East Bay Sanctuary Covenant*, 2018 WL 6428204, at *20 (concluding that "speculative" reasoning is insufficient to support good cause). The IFRs are devoid of any findings related to the issue. Indeed, the agencies cited no intervening legal authority for their justification, in contrast to when they issued an IFR in light of *Wheaton*. Given these failures, the agency action cannot be upheld on unexplained about-face.

The agencies further argue that the new IFRs will decrease insurance costs for entities remaining on more expensive grandfathered plans—which are exempt from the contraceptive coverage requirement—to avoid becoming subject to the requirement. 82 Fed. Reg. at 47,815; 82 Fed. Reg. at 47,855-56. This is speculation unsupported by the administrative record and is not sufficient to

30

constitute good cause. *See Valverde*, 628 F.3d at 1167 ("[C]onclusory speculative harms the [agency] cites are not sufficient" (citation omitted)).

We also highlight that there was no urgent deadline to issue the IFRs that interfered with the agencies from complying with the APA.[5] Congress had not imposed a deadline here on agency decisionmaking that interfered with compliance. The President's executive order merely asks the agencies to "consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate." 82 Fed. Reg. at 21,675. Neither did the Supreme Court mandate any deadline when it remanded the last challenge to the accommodation in order to give parties "an opportunity to arrive at an approach going forward." *Zubik*, 136 S. Ct. at 1560.

The agencies cite two cases in support of their good cause claim: *Priests For Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229 (D.C. Cir. 2014), *vacated and remanded sub nom. Zubik,* 136 S. Ct. at 1557; and *Serv. Employees Int'l Union, Local 102 v. Cty. of San Diego*, 60 F.3d 1346 (9th Cir. 1994). Both are distinguishable. The D.C. Circuit in *Priests for Life* rejected the plaintiffs' argument that the government lacked good cause to promulgate IFRs without

---

[5] We also point out that the agencies have not displayed urgency in reaching final resolution of this case. After filing this appeal from the district court's order granting a preliminary injunction, the agencies filed a stipulation staying further district court proceedings pending resolution of the appeal. Before the district court, this case has remained in abeyance for nearly a year.

notice and comment. 772 F.3d at 276–77. In so holding, it emphasized that the IFRs modified existing regulations that "were recently enacted pursuant to notice and comment rulemaking, and *presented virtually identical issues*" as the challenged IFRs. *Id.* at 276 (emphasis added); *see also id.* (describing the modifications in the new IFRs as "minor"). The IFRs here do not present minor changes. They substantially expanded the categorical exemption and effectively made accommodations voluntary. The IFRs also introduced an entirely new moral exemption that had never been the subject of previous regulations. These substantial changes came after the agencies previously determined that no change to the religious accommodation process was needed in light of RFRA. In *Serv. Employees Int'l Union*, we held that resolving uncertainty caused by conflicting judicial decisions is sufficient good cause. 60 F.3d at 1352 n.3. In that case, resolving uncertainty was sufficient because the agencies found that conflicting decisions were poised to cause "enormous" and "unforeseen" financial liability "threaten[ing] [the] fiscal integrity" of state and local governments. *Id.* When issuing the IFRs here, the agencies cited no such comparable financial threat.

Accordingly, based on the totality of the circumstances, the agencies likely did not have good cause for bypassing notice and comment.

We next turn to whether the agencies had statutory authority for bypassing notice and comment. The APA cautions "that no subsequent statute shall be

32

deemed to modify it 'except to the extent that it does so expressly.'" *Castillo-Villagra v. INS*, 972 F.2d 1017, 1025 (9th Cir. 1992) (quoting 5 U.S.C. § 559); *see also Asiana Airlines v. FAA*, 134 F.3d 393, 397 (D.C. Cir. 1998) (defining the inquiry as "whether Congress has established procedures so clearly different from those required by the APA that it must have intended to displace the norm"). The agencies point to three statutory provisions enacted as part of the Health Insurance Portability and Accountability Act of 1996 (HIPAA). These provisions specify:

> The Secretary, consistent with section 104 of the Health [Insurance] Portability and Accountability Act of 1996, may promulgate such regulations as may be necessary or appropriate to carry out the provisions of this subchapter. The Secretary may promulgate any interim final rules as the Secretary determines are appropriate to carry out this subchapter.

26 U.S.C. § 9833; 29 U.S.C. § 1191c; 42 U.S.C. § 300gg-92. When enacting the ACA, Congress codified the contraceptive coverage requirement in the same chapters of the United States Code as those provisions. The agencies argue that the provisions authorize them to issue IFRs implementing the ACA without notice and comment.

Their argument likely fails. The identified provisions authorize agencies to issue IFRs, but they are silent as to any required procedure for issuing an IFR. They do not provide that notice and comment is supplanted or that good cause is no longer required. They neither contain express language exempting agencies from the APA nor provide alternative procedures that could reasonably be

33

understood as departing from the APA. *See Castillo-Villagra*, 972 F.2d at 1025 (holding that a subsequent statute must "expressly" modify the APA). These provisions thus stand in contrast to other provisions that we have found to be express abdications of the APA. *See, e.g*, *id.* (holding that APA was supplanted by statute that stated "the procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section" (internal quotation marks omitted)); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1236 n.18 (D.C. Cir. 1994) (holding that APA was supplanted by statute that stated "[t]he Secretary *shall* cause to be published in the Federal Register a notice of the interim final DRG prospective payment rates" (emphasis added)).

The agencies insist that we must read HIPAA's use of the word "interim" as singlehandedly authorizing the agencies to issue IFRs without notice and comment *whenever the agencies deem it appropriate*. Otherwise, the agencies warn, we will be rendering superfluous the second sentence of the quoted provisions. We disagree.

The first sentence of the quoted provisions authorizes the issuance of regulations "consistent with section 104 of the Health [Insurance] Portability and Accountability Act of 1996." Section 104 of HIPAA, entitled "Assuring Coordination," generally requires the three Secretaries to coordinate their

34

regulations and policies.[6]  Notably, the second sentence of the quoted provisions

does *not* contain the same consistency requirement; each Secretary is authorized to

issue IFRs *without ensuring consistency with the rules of his or her partner*

*Secretaries*.  Reading both sentences together, Congress authorized the Secretaries

to issue coordinated final rules in the ordinary course; and, if a Secretary met an

inter-agency impasse but needed to regulate within his or her own domain

temporarily while sorting out the inter-agency conflict, then a Secretary could issue

an interim final rule.  In this procedural posture, we need not delimit the full scope

of the second sentence of the quoted provisions.  For present purposes, it suffices

---

[6] Section 104 states:

> The Secretary of the Treasury, the Secretary of Health and Human Services, and the Secretary of Labor shall ensure, through the execution of an interagency memorandum of understanding among such Secretaries, that—
>
> (1) regulations, rulings, and interpretations issued by such Secretaries relating to the same matter over which two or more such Secretaries have responsibility under this subtitle (and the amendments made by this subtitle and section 401) are administered so as to have the same effect at all times; and
>
> (2) coordination of policies relating to enforcing the same requirements through such Secretaries in order to have a coordinated enforcement strategy that avoids duplication of enforcement efforts and assigns priorities in enforcement.

Pub. L. No. 104-191, § 401, 110 Stat. 1976 (1996) (codified at 42 U.S.C. § 300gg-92 note).

to observe that we need not give the second sentence the agencies' expansive interpretation in order for the second sentence to retain independent effect.

Accordingly, the agencies likely did not have statutory authority for bypassing notice and comment.

We last turn to whether bypassing notice and comment was harmless. The court "must exercise great caution in applying the harmless error rule in the administrative rulemaking context." *Riverbend*, 958 F.2d at 1487. "[T]he failure to provide notice and comment is harmless only where the agency's mistake 'clearly had no bearing on the procedure used or the substance of decision reached.'" *Id.* (quoting *Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760, 764–65 (9th Cir. 1986)).

The circumstances here are similar to those in *Paulsen*, 413 F.3d at 1006. There, the Bureau of Prisons "failed to provide the required notice-and-comment period before effectuating [an] interim regulation, thereby precluding public participation in the rulemaking." *Id.* We held the error not harmless because "petitioners received no notice of any kind until after the Bureau made the . . . interim rule effective." *Id.* at 1007. We further emphasized that "an opportunity to protest an *already-effective* rule" did not render the violation harmless. *Id.* (emphasis added). We distinguished from prior cases where "interested parties received some notice that sufficiently enabled them to participate in the rulemaking

process before the relevant agency adopted the rule." *Id.* (citing cases). The agencies' actions here are analogous. No members of the public received notice of the IFRs or were able to comment prior to their effective dates.

Appellants argue that the states "were afforded multiple opportunities to comment on the scope of the exemption and accommodation during multiple rounds of rulemaking." These "opportunities" refer to public comment on prior rules regarding the religious exemption and accommodation. Appellants' argument does not convince us. As previously discussed, those prior rules were materially different from the IFRs here, which dramatically expanded the scope of the religious exemption and introduced a moral exemption that was not the subject of any previous round of notice and comment rulemaking. The public had no such notice or opportunity to comment on these potential changes, thus denying it the safeguards of the notice and comment procedure. This denial is comparable to failing to provide prior notice and comment before finalizing a rule that is not a "logical outgrowth" of the proposed rule, which an agency may not do without considering "whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." *NRDC v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002) (citation omitted); *see also CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009) (holding that notice of a proposed rule is sufficient to uphold a

final rule if interested parties "should have anticipated" the content of the rule). Accordingly, the prior "opportunities" are irrelevant.

The agencies argue that the states have failed to identify any specific comment that they would have submitted. There is no such requirement for harmless error analysis. The agencies also argue that the states had an opportunity to comment on the IFRs post-issuance and that the agencies will consider the comments before issuing final rules. This argument also fails. "The key word in the title 'Interim Final Rule' . . . is not interim, but *final*. 'Interim' refers only to the Rule's intended duration—not its tentative nature." *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1268 (D.C. Cir. 1996). We reiterate that "an opportunity to protest an *already-effective rule*" does not render an APA violation harmless. *Paulsen*, 413 F.3d at 1007 (emphasis added).

Accordingly, bypassing notice and comment likely was not harmless.

2.

A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). The analysis focuses on irreparability, "irrespective of the magnitude of the injury." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999).

The district court concluded that the states are likely to suffer irreparable harm absent an injunction. This decision was not an abuse of discretion. As

38

discussed in our standing analysis, it is reasonably probable that the states will suffer economic harm from the IFRs. Economic harm is not normally considered irreparable. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). However, such harm is irreparable here because the states will not be able to recover monetary damages connected to the IFRs. *See* 5 U.S.C. § 702 (permitting relief "other than money damages"); *see also Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015) (reaffirming that the harm flowing from a procedural violation can be irreparable). That the states promptly filed an action following the issuance of the IFRs also weighs in their favor. *Cf. Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm").

Again, appellants argue that the economic harm is speculative, which "does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (citation omitted). As we previously explained in our analysis of standing, the harm is not speculative; it is sufficiently concrete and supported by the record. Appellants also dispute the factual findings underlying the district court's holding of irreparable harm, but again fail to explain how the district court erred under our standard of review.

3.

Because the government is a party, we consider the balance of equities and the public interest together. *Jewell*, 747 F.3d at 1092.

The IFRs are an attempt to balance states' interest in "ensuring coverage for contraceptive and sterilization services" with appellants' interest in "provid[ing] conscience protections for individuals and entities with sincerely held religious [or moral] beliefs in certain health care contexts." 82 Fed. Reg. at 47,793. The district court concluded that the balance of equities and the public interest tip in favor of granting the preliminary injunction. The district court did not abuse its discretion.

The public interest is served by compliance with the APA: "The APA creates a statutory scheme for informal or notice-and-comment rulemaking reflecting a judgment by Congress that the public interest is served by a careful and open review of proposed administrative rules and regulations." *Alcaraz*, 746 F.2d at 610 (internal quotation marks and citation omitted). It does not matter that notice and comment could have changed the substantive result; the public interest is served from proper process itself. *Cf. Citizens for Better Forestry*, 341 F.3d at 976 (stating, in standing context, that "[i]t suffices that the agency's decision *could be influenced*" by public participation (alterations and citation removed) (emphasis in original)). The district court additionally found that the states face "potentially dire public health and fiscal consequences as a result of a process as to which they

had no input" and highlighted the public interest in access to contraceptive care. This finding is sufficiently supported by the record.

We acknowledge that free exercise of religion and conscience is undoubtedly, fundamentally important. Regardless of whether the accommodation violates RFRA, some employers have sincerely-held religious and moral objections to the contraceptive coverage requirement. *Cf. Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[A]lthough the plaintiff's free exercise claim is statutory rather than constitutional, the denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily"). Protecting religious liberty and conscience is obviously in the public interest. However, balancing the equities is not an exact science. *See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring) ("Balancing the equities . . . is lawyers' jargon for choosing between conflicting public interests"). We do not have a sufficient basis to second guess the district court and to conclude that its decision was illogical, implausible, or without support in the record. Finalizing that issue must await any appeal from the district court's future determination of whether to issue a permanent injunction.

E.

The district court enjoined enforcement of the IFRs nationwide because the agencies "did not violate the APA just as to Plaintiffs: *no* member of the public

41

was permitted to participate in the rulemaking process via advance notice and comment." The district court abused its discretion in granting a nationwide injunction. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) ("[A]n overbroad injunction is an abuse of discretion" (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)). We vacate the portion of the injunction barring enforcement of the IFRs in non-plaintiff states.

Crafting a preliminary injunction is "an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward." *Id.* (citation omitted). Although "there is no bar against . . . nationwide relief in federal district court or circuit court," such broad relief must be "*necessary* to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987) (emphasis in original removed in part); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" before the court). This rule

applies with special force where there is no class certification.[7]  *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification").

Before we examine the scope of the injunction here, we highlight several concerns associated with overbroad injunctions, particularly nationwide ones.  Our concerns underscore the exercise of prudence before issuing such an injunction. First, "nationwide injunctive relief may be inappropriate where a regulatory challenge involves important or difficult questions of law, which might benefit from development in different factual contexts and in multiple decisions by the various courts of appeals."  *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011).  The Supreme Court has repeatedly emphasized that nationwide injunctions have detrimental consequences to the development of law and deprive appellate courts of a wider range of perspectives.  *See Califano*, 442 U.S. at 702 (highlighting that nationwide injunctions "have a detrimental effect by foreclosing adjudication by a number of different courts and judges"); *United States v. Mendoza*, 464 U.S. 154, 160 (1984) (concluding that allowing nonmutual

---

[7] Indeed, Congress has recently proposed a bill that would prohibit injunctions involving non-parties "unless the non-party is represented by a party acting in a representative capacity pursuant to the Federal Rules of Civil Procedure."  H.R. 6730, 115th Cong. (2018)

43

collateral estoppel against the government would "substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue" and "deprive [the Supreme] Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before [the Supreme] Court grants certiorari"); *Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995) (Ginsburg, J., dissenting) ("We have in many instances recognized that when frontier legal problems are presented, periods of 'percolation' in, and diverse opinions from, state and federal appellate courts may yield a better informed and more enduring final pronouncement by this Court").

The detrimental consequences of a nationwide injunction are not limited to their effects on judicial decisionmaking. There are also the equities of non-parties who are deprived the right to litigate in other forums. *See* Zayn Siddique, *Nationwide Injunctions*, 117 COLUM. L. REV. 2095, 2125 (2017) ("A plaintiff may be correct that a particular agency action is unlawful or unduly burdensome, but remedying this harm with an overbroad injunction can cause serious harm to nonparties who had no opportunity to argue for more limited relief"). Short of intervening in a case, non-parties are essentially deprived of their ability to participate, and these collateral consequences are not minimal. Nationwide injunctions are also associated with forum shopping, which hinders the equitable administration of laws. *See* Samuel L. Bray, *Multiple Chancellors:*

44

*Reforming the National Injunction*, 131 HARV. L. REV. 417, 458-59 (2017) (citing

five nationwide injunctions issued by Texas district courts in just over a year).

These consequences are magnified where, as here, the district court stays

any effort to prepare the case for trial pending the appeal of a nationwide

preliminary injunction. We have repeatedly admonished district courts not to

delay trial preparation to await an interim ruling on a preliminary injunction. *See,*

*e.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 1002–03 (9th Cir. 2012); *Global*

*Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1058 (9th Cir. 2007).

"Because of the limited scope of our review of the law applied by the district court

and because the fully developed factual record may be materially different from

that initially before the district court, our disposition of appeals from most

preliminary injunctions may provide little guidance as to the appropriate

disposition on the merits." *Id.* at 1003 (quoting *Sports Form, Inc. v. United Press*

*Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982)). The district court here failed to give

any particular reason for the stay,[8] and this case could have well proceeded to a

disposition on the merits without the delay in processing the interlocutory appeal.

"Given the purported urgency of" implementing the IFRs, the agencies and

intervenors might "have been better served to pursue aggressively" its defense of

---

[8] The district court stayed the case pending the outcome of this appeal based on the parties' stipulation. The order staying the case provides no other justification or analysis supporting the stay.

45

the IFRs in the district court, "rather than apparently awaiting the outcome of this appeal." *Global Horizons*, 510 F.3d at 1058.

In light of these concerns, we now address the preliminary injunction issued here. The scope of the remedy must be no broader and no narrower than necessary to redress the injury shown by the plaintiff states. The plaintiff states argue that complete relief to them would require enjoining the IFRs in all of their applications nationwide. That is not necessarily the case. *See L.A. Haven Hospice*, 638 F.3d at 665 (vacating the nationwide portion of an injunction barring the enforcement of a facially invalid regulation); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244–45 (9th Cir. 2018) (vacating nationwide portion of injunction barring enforcement of executive order). The scope of an injunction is "dependent as much on the equities of a given case as the substance of the legal issues it presents," and courts must tailor the scope "to meet the exigencies of the particular case." *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087 (citations omitted). The circumstances of this case dictate a narrower scope.

On the present record, an injunction that applies only to the plaintiff states would provide complete relief to them. It would prevent the economic harm extensively detailed in the record. Indeed, while the record before the district court was voluminous on the harm to the plaintiffs, it was not developed as to the economic impact on other states. *See City & Cty. of San Francisco*, 897 F.3d at

46

1231, 1244–45 (holding that the district court abused its discretion in issuing a nationwide injunction because the plaintiffs' "tendered evidence is limited to the effect of the Order on their governments and the State of California" and because "the record is not sufficiently developed on the nationwide impact of the Executive Order"). The injunction must be narrowed to redress only the injury shown as to the plaintiff states.[9]

Accordingly, we conclude that the scope of the preliminary injunction is overbroad and that the district court abused its discretion in that regard. District judges must require a showing of nationwide impact or sufficient similarity to the plaintiff states to foreclose litigation in other districts, from Alaska to Puerto Rico to Maine to Guam.

IV.

We affirm that venue is proper in the Northern District of California. We affirm that the plaintiff states have standing to sue. Although we affirm the preliminary injunction, the record does not support the injunction's nationwide scope. We vacate the portion of the injunction barring enforcement of the IFRs in other states and remand to the district court. This panel will retain jurisdiction for

---

[9] Appellants did not clearly raise other arguments in support of a narrower injunction, including the potential for "substantial interference with another court's sovereignty," *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 770 (9th Cir. 2008), and the lack of need for courts to apply the law uniformly. Accordingly, we do not address them.

47

any subsequent appeals arising from this case. Costs on appeal are awarded to

Plaintiffs-Appellees. The mandate shall issue forthwith.

**AFFIRMED IN PART, VACATED IN PART, and REMANDED.**

**State of California v. Little Sisters of the Poor**, No. 18-15144+

Kleinfeld, Senior Circuit Judge, dissenting:


I respectfully dissent. The plaintiff state governments lack standing, so the district court lacked jurisdiction. The reason they lack standing is that their injury is what the Supreme Court calls "self-inflicted," because it arises solely from their legislative decisions to pay these moneys. Under the Supreme Court's decision in Pennsylvania v. New Jersey,[1] we are compelled to reverse.


Pennsylvania sued New Jersey on the theory that a new New Jersey tax law caused the Pennsylvania fisc to collect less money.[2] Pennsylvania granted a tax credit for income taxes paid to other states, and New Jersey under its new tax law had begun taxing the New Jersey-derived income of nonresidents.[3] Maine, Massachusetts, and Vermont sued New Hampshire on similar grounds.[4] The concrete financial injury was plain in all these cases. Like the plaintiff states'

---

[1] 426 U.S. 660 (1976) (per curiam).

[2] Id. at 662.

[3] Id. at 663.

[4] Id.

1

injury in the case before us, the reason why was the plaintiff states' laws.[5]

The Court in <u>Pennsylvania</u> invoked the long established principle that under <u>Massachusetts v. Missouri</u>,[6] the injuries for which redress was sought had to be "directly caused" by the defendant states.[7]  They were held not to be "directly caused" so in <u>Pennsylvania</u> because the monetary losses resulted from the plaintiff states' own laws.[8]  Though it was undisputed that the defendant states' tax schemes had cost the plaintiff states money, the defendant states were held not to have "inflicted any injury,"[9] because the monetary harms were "self-inflicted:"[10]

> The injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions made by their respective state legislatures.  Nothing required Maine, Massachusetts, and Vermont to extend a tax credit to their residents for income taxes paid to New Hampshire, and nothing prevents Pennsylvania from withdrawing that credit for taxes paid to New Jersey.  No state can be heard to complain about damage

---

[5] <u>Id.</u>

[6] 308 U.S. 1, 15 (1939).

[7] <u>Pennsylvania</u>, 426 U.S. at 664.

[8] <u>Id.</u>

[9] <u>Id.</u>

[10] <u>Id.</u>

2

inflicted by its own hand.[11]

California and the other plaintiff states in the case before us have pointed out that their legislative schemes were in place before the federal regulatory change that will cost them money. But Pennsylvania does not leave room for such a "first in time, first in right" argument. Vermont's law, for instance, long preceded New Hampshire's, but the court held that any "injury" was "self-inflicted" because Vermont need not have extended tax credits to its residents at all.[12] The states could also have prevented their financial injury by changing their laws.[13] As the concurring opinion put it, "[t]he appellants therefore, [we]re really complaining about their own statute[s]."[14]

Pennsylvania differs from the case before us because the dispute was between coequal sovereigns in Pennsylvania, heard under the Court's original jurisdiction, and here it is between state governments and the federal government.

---

[11] Id.

[12] Id.; see 32 V.S.A. § 5825 (1966); N.H. R.S.A. § 77-B:2 (1970).

[13] Pennsylvania, 426 U.S. at 664.

[14] Id. at 667.

3

But Pennsylvania's rejection of "self-inflicted" injury has been applied outside the original jurisdiction context.[15] There is no conflict between the federal and state laws, so the sovereign rights of the plaintiff states cannot establish standing.[16] Though the plaintiff states may under their own laws spend additional money to provide benefits to some women that they would not have had to pay for before the federal change, they remain free to decide whether to do so.

As the majority acknowledges, the "irreducible minimum" for standing is that "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[17] All three minima are perhaps debatable, but

---

[15] See Clapper v. Amnesty Intern. USA, 568 U.S. 398, 416 (2013).

[16] Sturgeon v. Masica, 768 F.3d 1066, 1074 (9th Cir. 2014), vacated and remanded sub nom. Sturgeon v. Frost, 136 S. Ct. 1061 (2016) (rejecting "standing based simply on purported violations of a state's sovereign rights" and requiring "evidence of actual injury" where state failed to "identify any actual conflict between [federal agency regulations] and its own statutes and regulations"); Sturgeon v. Frost, 872 F.3d 927, 929 (9th Cir. 2017), cert. granted, 138 S. Ct. 2648 (2018) (explaining prior holding as to state standing was "unaffected by the Supreme Court's vacatur of [the] prior opinion"); Virginia ex rel. Cuccinelli v. Sebelius, 656 F.3d 253, 270 (4th Cir. 2011) (holding state lacked standing where it failed to identify enforcement of state statute that "conflict[ed]" with the individual mandate of the ACA).

[17] Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016).

causation, that is, "traceability," is controlled by <u>Pennsylvania</u>. That case establishes that harm to the fisc of a plaintiff state because of its own statute is "self-inflicted," and therefore not "traceable to the challenged conduct of the defendant."[18] Traceability fails if the expense to the state results from its own law and without that state legislative choice, could be avoided. The federal regulatory change itself imposes no obligation on the states to provide money for contraception. The plaintiff states choose to provide some contraception benefits to employees of employers exempted by the federal insurance requirement, so the narrowing of the federal mandate may lead to the states spending more because some employers may spend less. Nor can the plaintiff states invoke the doctrine of <u>parens patriae</u> to gain standing.[19]

I recognize that the Fifth Circuit took a different view in different

---

[18] <u>Pennsylvania</u>, 426 U.S. at 664; <u>Spokeo</u>, 136 S. Ct. at 1547.

[19] <u>See</u> <u>Massachusetts v. EPA</u>, 549 U.S. 497, 520 n.17 (2007) (explaining that state actions against the federal government "to protect [its] residents from the operation of federal statutes" are precluded); <u>Sierra Forest Legacy v. Sherman</u>, 646 F.3d 1161, 1178 (9th Cir. 2011) ("California, like all states, 'does not have standing as <u>parens patriae</u> to bring an action against the Federal Government.'" (quoting <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico</u>, 458 U.S. 592, 610 n.16 (1982))).

5

circumstances in <u>Texas v. United States</u>.[20]  There, the Fifth Circuit held that states

did indeed have standing to challenge a new federal program relating to

immigration.[21]  Texas was held to have standing because federal regulatory change

on its administration of drivers' licenses  – requiring it to issue drivers' licenses to

illegal aliens – would cost it money.[22]  The Fifth Circuit rejected application of the

<u>Pennsylvania</u> "self-inflicted injury" rule, but stressed that its decision "is limited to

these facts."[23]  It is not plain that the Fifth Circuit would extend its view of

standing to the quite different facts before us.  The regulatory change regarding

contraception poses no challenge to the sovereign authority of California to

provide contraceptive benefits or not, but the regulatory change in <u>Texas</u> did limit

the legislative choices Texas could make without "running afoul of preemption or

the Equal Protection Clause."[24]  Nor can we be sure that <u>Texas</u> is good law.  The

Supreme Court granted certiorari on the question whether "a State that voluntarily

provides a subsidy" has standing to challenge a federal change that would expand

---

[20] 809 F.3d 134 (5th Cir. 2015), <u>as revised</u> (Nov. 25, 2015).

[21] <u>Id.</u> at 162.

[22] <u>Id.</u> at 155-57.

[23] <u>Id.</u> at 154.

[24] <u>Id.</u> at 153; <u>see also</u> <u>Zango, Inc. v. Kaspersky Lab, Inc.</u>, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) ("An amicus curiae generally cannot raise new arguments on appeal." (citations omitted)).

6

its subsidy, and other issues.[25]  The Court was "equally divided," so the questions were not answered.[26]

The majority errs in treating <u>Wyoming v. Oklahoma</u>[27] as though it overruled <u>Pennsylvania</u>.[28]  It does not say so.  And the Court doubtlessly would have said so had that been its intent.  Nor is the self-inflicted injury doctrine even relevant to <u>Wyoming</u>, which is doubtless why <u>Wyoming</u> does not discuss <u>Pennsylvania</u>.  In <u>Pennsylvania</u>, the plaintiff states could have avoided any lost revenue by changing

---

[25] <u>United States v. Texas</u>, 136 S. Ct. 906 (2016); Pet. for Writ of Cert. at I, <u>United States v. Texas</u>, No. 15-674 (U.S. Nov. 20, 2015).

[26] <u>United States v. Texas</u>, 136 S. Ct. 2271, 2272, <u>reh'g denied</u>, 137 S. Ct. 285 (2016).

[27] 502 U.S. 437 (1992).

[28] Of course, it does not matter when jurisdiction is raised, since we must raise it whenever its absence appears likely.  See <u>Interpipe Contracting, Inc. v. Becerra</u>, 898 F.3d 879, 891 n.9 (9th Cir. 2018) ("Because Article III standing is jurisdictional, we must <u>sua sponte</u> assure ourselves.").  And the majority errs in saying that the self-inflicted harm doctrine was not raised by the parties. **See Reply Br. of March for Life at 29, Dkt. No. 95**.  Much of the briefing before us addresses standing, and the appellee states were also provided an opportunity to address self-inflicted injury at oral argument.  And it does not matter that the self-inflicted injury doctrine arose in the context of a case taken under the Court's original jurisdiction, because it is a straightforward application of the generally applicable causation requirement for standing.  See <u>Clapper</u>, 568 U.S. at 416 (applying <u>Pennsylvania</u>'s "self-inflicted" doctrine outside the original jurisdiction context); <u>Texas</u>, 809 F.3d at 158-59 (same).

7

their own laws granting tax credits for taxes paid to the defendant states. By contrast, Wyoming could not prevent the expense to its fisc by changing its own law.[29] Wyoming lost severance tax revenue because the new Oklahoma law required major Oklahoma coal consumers to replace a substantial part of the Wyoming coal they burned with Oklahoma coal, so less coal was mined in Wyoming.[30] Since the Wyoming legislature could not change the Oklahoma law, the harm to Wyoming's fisc was not self-inflicted. The Oklahoma law, which expressly targeted Wyoming, caused the injury.[31] In our case, as in Pennsylvania, the plaintiff states elected to pay money in certain circumstances, and can avoid the harm to their fiscs by choosing not to pay the money.

I agree with the federal position that the plaintiff states lack standing to bring this case in federal court. Because such a conclusion would preclude us from reaching the other issues in the case, I do not speak to them in this dissent. Nor do I address additional reasons why the plaintiff states may lack standing, since the

---

[29] Wyoming, 502 U.S. at 447; see also Texas, 809 F.3d at 158 ("Wyoming sought to tax the extraction of coal and had no way to avoid being affected by other states' laws that reduced demand for that coal." (emphasis added)).

[30] Id. at 443, 445-47.

[31] Id. at 443.

"self-inflicted injury" disposes of the question without them.